<u>**NOT FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
*In re:*
:
Dean A Heinemann : Chapter 13
and Krin Heinemann, : Case No. 19-35692
:
  *Debtors.*
---------------------------------------------------------x
Christine Schlosser,
  Plaintiff,
:
:
v. : Adversary Proceeding
: Case No. 19-09028
:
Dean A Heinemann,
  Defendant.
---------------------------------------------------------x

**DECISION FOLLOWING TRIAL:
<u>FINGINGS OF FACT AND CONCLUSIONS OF LAW</u>**

**A P P E A R A N C E S :**

*Counsel for the Plaintiff, Christine Schlosser*
Genova, Malin & Trier LLP
Hampton Business Center
1136 Route 9
Wappingers Falls, NY 12590
By: Michelle L. Trier

*Counsel for the Defendant, Dean A. Heinemann*
Law Offices of Thomas J. Minotti, P.C.
1131 Route 55
Suite, 6
Lagrangeville, New York 12540
By: Thomas J. Minotti

**CECELIA G. MORRIS
UNITED STATES BANKRUPTCY JUDGE**

This matter came before the Court pursuant to the plaintiff's objection to the dischargeability of a debt owed by the defendant under 11 U.C. § 523(a)(4) and § 523(a)(19). After a trial held on July 18, 2022 and having considered the pleadings and all of the evidence presented, the Court holds that the Plaintiff has not shown by the preponderance of the evidence that the debt owed to her was one for fraud or defalcation while acting in a fiduciary capacity or for the violation of any of the Federal securities laws and therefore the defendant's discharge should not be denied.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

## BACKGROUND

On April 26, 2019, Dean A. Heinemann ("Defendant" or "Debtor") filed a petition under chapter 13 of the Bankruptcy Code. *In re Heinemann*, No. 19-35692 (Bankr. S.D.N.Y. filed April 26, 2019).[1] On July 29, 2019, Christine Schlosser ("Plaintiff"), commenced this adversary proceeding against Defendant seeking a judgment from this Court determining that the debt owed to Plaintiff in the amount of $250,000, together with interest and attorneys' fees, is nondischargeable. Compl., ECF[2] No. 1. Plaintiff alleges under Count II that the debt is nondischargeable under § 523(a)(4), for fraud or defalcation while acting in a fiduciary capacity, and under Count IV that the debt was nondischargeable under § 523(a)(19), as a debt that resulted from a violation of securities law.[3]

---

[1] The petition was filed with a joint debtor, Krin Heinemann, who is not a party in this adversary proceeding.
[2] Unless otherwise indicated, all references to "ECF" are references to this Court's electronic docket in adversary proceeding 19-09028-cgm.
[3] On September 30, 2020, the Plaintiff withdrew the cause of action under § 523(a)(6), Count III.

Page **2** of **14**

The Plaintiff and the Defendant filed separate motions for summary judgment on September 16, 2020. On November 4, 2020, the Court entered an order denying the Plaintiff's motion for summary judgment. On November 17, 2020, the Court entered an order granting the Defendant's motion for summary judgment as to Count I, nondischargeability under § 523(a)(2)(B). The Court denied the Defendant's motion for summary judgment as to the remaining causes of action. Thus, two of the Plaintiff's causes of action alleged in his complaint remain viable.

Clayborne Group LLC ("Clayborne") was an investment advisor firm owned by Defendant and formed by him in 2005. Trial Tr. 98:13–99:7, July 18, 2022, ECF No. 78. Defendant was the managing member of Clayborne and the only employee of the firm who advised clients regarding investments. Trial Tr. 99:7–19. Defendant would introduce himself to clients as the owner of Clayborne and as a financial advisor. Trial Tr. 99:8–12. Clayborne had approximately twenty-five clients, who were obtained by way of "[r]eferral, mostly." Trial Tr. 100:14–20.

Plaintiff was a client of Clayborne. Plaintiff's husband died suddenly in July 2009, leaving Plaintiff and their two children the proceeds of his life insurance policies, totaling approximately one million dollars. Trial Tr. 17:15–25, 18:1–4. The Plaintiff and Defendant had known each other personally and met in years preceding the death of Plaintiff's husband. Trial Tr. 16:17–25 "I knew [Defendant's] name, 'cause we all went to the same high school, and his father was a P.E. teacher where I went to school; but probably, moved into the house in 2000, so maybe around -- you know, I'd seen him up at [Defendant's sister]'s (phonetic) house maybe here and there -- around 2000, 2001;" Trial Tr. 105:24–106:3 ("I met Ms. Schlosser a few times at my sister's house, typically during birthday parties of my -- my nieces; but maybe twice I met her prior to meeting her in 2009 for the -- for -- in August of 2009."). Plaintiff contacted Defendant after getting his contact information from Defendant's sister and had meeting with Defendant in August 2009 to discuss potential investments of the insurance proceeds. Trial Tr. 17:1–4; 106:4–13.

On September 18, 2009, Plaintiff signed a client service agreement ("Agreement") with Defendant in his capacity as managing director of Clayborne. Trial Tr. 122:20–25; Pl.'s Ex. 1, Clayborne Client Service Agreement. The Agreement provides for an initial investment of $600,000 of Plaintiff's money to be made through Clayborne. Pl.'s Ex. 1, Clayborne Client Service Agreement. The Agreement states that Plaintiff "[d]oes not grant discretionary trading authority to Clayborne." *Id.*

In May 2010, Plaintiff made an investment of $100,000 through Clayborne into the 4S Private Equity Fund (the "4S Fund"). Trial Tr. 55:3–15, 137:4–16; *see also* Def.'s Ex. 2 Fidelity Request Form. In September 2010, Plaintiff made investments totaling $200,000 through Clayborne into the CG Income Fund, LLC (the "CG Fund"). Trial Tr. 141:1–24; *see also* Def.'s Exs. 3, 8. Defendant was the manager of the CG Fund, a private equity fund. Trial Tr. 115:15–24. Approximately one year later, the CG Fund was defunct and Defendant was notified that the "senior lender was gonna be foreclosing on the assets, and there'd be no more payments". Trial Tr. 125:12–21.

Years later, Clayborne ceased operations and Defendant stopped work as an investment advisor as a result of a Securities and Exchange Commission ("SEC") order imposing remedial sanctions and a cease and desist order. Trial Tr. 98:5–9, 128:1–129:4; *see also* Pl.'s Ex. 8, April 5, 2018 SEC Order. In January 2018, Plaintiff commenced a Financial Industry Regulatory Authority ("FINRA") proceeding against Defendant and Clayborne, resulting in an arbitration award of $250,000 in compensatory damages. Trial Tr. 48:2–7; *see also Schlosser v. Clayborne Group LLC*, Docket No. 18-0027, 2019 WL 1490238 (FINRA), at *1 (Mar. 28, 2019).

At trial and in the post-trial memorandum, Plaintiff argues that Defendant's debt of $250,000 is nondischargeable under Section 523(a)(4) due to a breach of fiduciary duty owed to Plaintiff. Plaintiff further argues that the debt is non-dischargeable under Section 523(a)(19) as a

violation of federal securities laws. The Defendant argues that there was no fiduciary duty owed to the Plaintiff and no fraud or defalcation was a result of any actions by the Defendant. Defendant argues that Plaintiff provided no evidence that the FINRA award was the result of a violation of federal securities law.

## DISCUSSION

### I. Nondischargeability under § 523(a)(4).

Count II alleges that the debt owed to the Plaintiff by the Debtor is nondischargeable under § 523(a)(4), which excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity . . . ." 11 U.S.C. § 523(a)(4). A creditor must establish nondischargeability under § 523(a) "by the preponderance of the evidence." *Murphy v. Snyder* (*In re Snyder*), 939 F.3d 92, 101 (2d Cir. 2019) (quoting *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006)).

<u>Whether there was a fiduciary relationship</u>

Under section 523(a)(4), a plaintiff must show first that the defendant was acting in a fiduciary capacity "with respect to the particular conduct giving rise to the liability which is claimed to be non-dischargeable." *In re Deutsch*, 575 B.R. 590, 600 (Bankr. S.D.N.Y. 2017) (internal quotations omitted).

The meaning of the term "fiduciary" is a matter of federal law. *In re Deutsch*, 575 B.R. at 600. The term "fiduciary capacity," as it is used in the dischargeability context, applies only to express or technical trusts; it excludes constructive trusts, implied trusts, and trusts created merely on the basis of wrongful conduct. *Zohlman v. Zoldan*, 226 B.R. 767, 772 (S.D.N.Y. 1998); *see also Sandak v. Dobrayel* (*In re Dobrayel*), 287 B.R. 3, 14 (Bankr. S.D.N.Y. 2002) ("The meaning of 'fiduciary capacity' under Federal laws is more restricted than under the more general common law or state definitions.").

The fiduciary relationship "must exist prior to the act creating the debt; a trust relationship

cannot be said to arise merely from the wrongful conduct itself." *In re Deutsch*, 575 B.R. at 600 (quoting *In re Zohlman*, 226 B.R. at 773); *New Jersey v. Kaczynski* (*In re Kaczynski*), 188 B.R. 770, 773 (Bankr.D.N.J.1995) ("[I]mplied or constructive trusts and trusts ex maleficio are not deemed to impose fiduciary relationships under the Bankruptcy Code").

Bankruptcy courts "may look to state law to determine whether a trust exists." *See Chitester v. Watterson (In re Watterson)*, 524 B.R. 445, 451 (Bankr. E.D.N.Y. 2015); *Zohlman*, 226 B.R. at 773 ("Federal law tells us that only express or technical trusts create a fiduciary relationship in this context, but state law tells us when an express or technical trust exists in the individual case."). *Wolf v. Simone* (*In re Simone*), No. 18-21993 (JJT), Adv. Pro. No. 19-02005, 2022 WL 393359, at *28 (Bankr. D. Conn. Feb. 8, 2022) (quoting *In re Hayes*, 183 F.3d at 166) ("And while 'the precise scope of the defalcation exception is a question of federal law, its application frequently turns upon obligations attendant to relationships governed by state law. For example, state law can be an important factor in determining whether someone acted in a fiduciary capacity under Section 523(a)(4).'")

Under New York law, a fiduciary duty merely due to a broker-customer relationship "can arise only where the customer has delegated discretionary trading authority to the broker." *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998). "[W]here the customer maintains a nondiscretionary account, the broker's duties are quite limited." *Id.*

Where, on the other hand, a "close relationship" between the parties "far exceed[s] that of an arms-length commercial relationship between a securities broker and his client," a fiduciary relationship may exist. *Marini v. Adamo*, 644 F. App'x 33, 35 (2d Cir. 2016) (finding the plaintiff's "complete confidence and reliance" in the defendant to be sufficient to create a fiduciary duty under state law). Furthermore, a defendant acting as both a broker and an advisor may owe his client a fiduciary relationship. *Whitaker Secs., LLC v. Rosenfeld* (*In re Rosenfeld*), 543 B.R. 60, 75

(Bankr. S.D.N.Y. 2015) (listing cases). And an investment advisor "stands in a fiduciary relationship with his client" whether or not the advisor's placement of funds was done with the consent of the client. *Wachtel v. Rich* (*In re Rich*), 353 B.R. 796, 806 (Bankr. S.D.N.Y. 2006).

The Second Circuit has found that the application of Section 523(a)(4) is "not limited to express trusts," rather, the exception applies where there is "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendancy over the latter." *Andy Warhol Found. v. Hayes (In re Hayes)*, 183 F.3d 162, 167 (2d Cir. 1999) (quoting *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994)); *see also William M. Bryan, Inc. v. Brody* (*In re Brody*), Adv. Pro. No. 17-08282 (SHL), 2019 WL 4879170, at *3 (Bankr. S.D.N.Y. Sept. 30, 2019); *McFeely Ltd. P'ship v. Dilworth* (*In re Dilworth*), No. 18-31552 (AMN), 2022 WL 987044, at *17 (Bankr. D. Conn. Mar. 31, 2022).

At trial, the Court heard credible testimony of a close relationship between the parties. Following the recent death of her husband, Plaintiff was "overwhelm[ed]" by the change in her financial circumstances from taking home around $600 per week to receiving close to one million dollars in proceeds of insurance. Trial Tr. 16:2–4, 17:10–20. Plaintiff had known of Defendant and known his immediate family for years before their first business meeting. Trial Tr. 16:16–25. She was referred to Defendant by his sister, who was then a close friend of the Plaintiff. Trial Tr. 17:1–9. Defendant made multiple visits to Plaintiff's house to discuss investing prior to the time she officially became a client. Trial Tr. 106:9–21. Plaintiff recalls Defendant joking with her about her moving in with him years later, after informing her of the loss of the investments,. Trial Tr. 47:19–23.

The business relationship also appears to have been more than that of a typical, arm's length broker. Defendant introduced himself to clients as the owner of Clayborne and as a financial advisor. Trial Tr. 99:8–12. Plaintiff understood her meeting with Defendant as one where he

advised her on how to invest the insurance proceeds. Trial Tr. 26:10–13 ("He explained to me, you know, what we were going to be doing with the money, and how it would be, you know, like I -- I wanted -- that I -- I wanted to make sure that I was always to be able to get money if I needed it."). At Trial, Plaintiff revealed how much she relied on Defendant at the time. Trial Tr. 27:2–29:5 (Plaintiff failing to understand what monitoring an investment entailed and believing that Defendant would "do the right thing, and -- and take care of me, and -- and, you know."). Plaintiff further showed how little knowledge and experience she had in investing. Trial Tr. 38:18–23 ("I have no knowledge of the stock market still; 13 years later, I still don't understand it. People try to explain it to me. I just -- it's -- it's not my thing. It -- I don't -- I don't do this. You know, that's why I have somebody else -- you know, had hired somebody else to do this for me, because I don't understand the stock market at all."); *see also* Trial Tr. 39:23–24 (Plaintiff unable to pronounce the word 'memorandum'). Plaintiff's understanding of her investments were rudimentary. *See* Trial Tr. 44:7–13 ("And he did explain, you know, like stuff happens. But for the most part, you know, I told him I wanted to be able to take care of the kids with this money. I wanted to be able to retire. I wanted to be able to not have to have three jobs at 47 to take care of my three kids, and put them through college."). Plaintiff was not aware of how her investments with certain mutual funds were made or what those funds were. Trial Tr. at 38:24–25, 39:1–8, 13–15. She was not aware of what a hedge fund is or how one works. Trial Tr. at 43:10–12. She was unaware at the time that the Defendant was the manager of one fund. Tr. at 43:13–21.

While Plaintiff opened a nondiscretionary account with Clayborne (Pl.'s Ex. 1, Clayborne Client Service Agreement), Defendant's relationship to the Plaintiff exceeded that of a typical arm's length broker's to their client. The testimony showed Defendant occupied "a position of ascendancy over" the Defendant due to the difference in knowledge and power between the two. The Court finds that Defendant owed Plaintiff fiduciary duties that would subject his actions to

potential liability under 11 U.S.C. § 523(a)(4).  The next question is whether there was fraud or defalcation as to those duties.

Whether the actions taken constitute fraud or defalcation

After establishing that the defendant was acting in a fiduciary capacity, the Plaintiff must further show that the debtor engaged in fraud or defalcation within the meaning of the bankruptcy code.  *In re Deutsch*, 575 B.R. at 600–01.  The Court makes a determination that fraud or defalcation has occurred "only when the threshold determination that the debtor acted in a fiduciary capacity has been made."  *Murphy v. Snyder* (*In re Snyder*), 939 F.3d 92, 101 (2d Cir. 2019) (quoting *In re Hayes*, 183 F.3d at 170).

For finding fraud, the Bankruptcy Code incorporates the common law.  *See Mirarchi v. Nofer* (*In re Nofer*), 514 B.R. 346, 355–56 (Bankr. E.D.N.Y. 2014). (citing *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006) ("The Bankruptcy Code incorporates the common law elements of fraud, 'includ[ing] a false representation, scienter, reliance, and harm.'")).  The Plaintiff must show some form intentional deceit.  *Id.* (citing *Evans*, 469 F.3d at 283).

Defalcation requires "a culpable state of mind," specifically, "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269, 133 S. Ct. 1754, 185 L. Ed. 2d 922 (2013).  This may be met by a showing of actual knowledge of wrongdoing, conscious disregard to a substantial and unjustifiable risk of violating a fiduciary duty, or willful blindness to the same.  *In re Snyder*, 939 F.3d at 102.  This standard "insures that the harsh sanction of non-dischargeability is reserved for those who exhibit 'some portion of misconduct.'"  *Denton v. Hyman* (*In re Hyman*), 502 F.3d 61, 68–69 (2d Cir. 2007) (quoting *Cent. Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 512 (2d Cir. 1937)).

Plaintiff argues that Defendant's advised Plaintiff to invest in unacceptably risky funds "for

his own beneficial gain knowing the risky nature of same." Pl.'s Post-Trial Mem 11, ECF No. 79. This was supposedly done while "ignor[ing] Plaintiff's risk tolerance" and her "ability to absorb risk." *Id.* Testimony at Trial failed to support these claims.

Plaintiff testified that she did not "recall any conversations regarding risk tolerance" during her initial meetings with Defendant. Trial Tr. 44:12–13, July 18, 2022, ECF No. 78. Defendant testified to having spoken to Plaintiff about the different "low-, medium-, and high-risk investments" Clayborne offered. Trial Tr. 109:20–110:5. Defendant offered a set of recommendations in different low, high, and medium risk groups for Plaintiff to select. Trial Tr. 113:23–114:4. Plaintiff selected investing with the CG Fund, a high-risk hedge funds managed by Defendant, out of approximately 13 total investments she made. Trial Tr. 114:2–4, 115:16–116:9. Plaintiff invested approximately $300,000 or a third of her assets in the higher-risk funds. Trial Tr. 117:20–22, 119:16–21.

The Court heard testimony from the Plaintiff's expert witness, a former investment advisor with Wells Fargo, that offering these investments failed to meet SEC suitability standards. Trial Tr. 82:4–24; *see also* Pl.'s Ex. 6, ¶¶ 5–6, Report of Expert Witness. The expert witness offered testimony that Defendant breached a fiduciary duty as a financial advisor in part due to offering the high-risk hedge funds as investment options. Trial Tr. 83:5–11; *see also* Pl.'s Ex. 6, ¶ 6.

The evidence shows that the advice given to Plaintiff to invest in the CG Fund resulted in large losses. The advice may have been inappropriately high-risk for the plaintiff and may even have been reckless. The Plaintiff has failed to offer any evidence of intentional deceit, and Defendant's actions cannot be said to have amounted to fraud. Similarly, Plaintiff has failed to show how Defendant's actions could amount to "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *See Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269, 133 S. Ct. 1754, 185 L. Ed. 2d 922 (2013). The Court cannot find evidence of

defalcation to justify the harsh sanction of non-dischargeability.

Plaintiff testified that Defendant failed to inform Plaintiff for several years of her investment losses, even while discussing with her whether to close her daycare business. Trial Tr. 46:6–48:1, July 18, 2022, ECF No. 78. Defendant testified to having "met with every client and notified them of the situation" regarding the CG Fund and their chances of recovery of assets between November and December of 2011. Trial Tr. 125:22–126:9.

Even if the court were to find this testimony may provide evidence of Defendant's recklessness or state of mind, it is difficult to see it as the basis for relief under Section 523(a)(4). The Plaintiff must allege a debt "*for* fraud or defalcation" (11 U.S.C. § 523(a)(4) (emphasis added)) for the Court to find the debt nondischargeable. The supposed failure to inform Plaintiff occurred after her investments had already been "wiped out." Pl.'s Post-Trial Mem 3, ECF No. 79. The Plaintiff closed her daycare business in 2016, approximately five years after the CG Fund was defunct. Trial Tr. 46:5–11, 125:15–25. These actions of the Defendant do not show fraud or defalcation with respect to the circumstances of Plaintiff's investments years earlier, which was the basis of the debt. On the evidence presented, the Court cannot find that the debt to Plaintiff was for fraud or defalcation while acting in a fiduciary capacity.

**II.    Nondischargeability under § 523(a)(19); Count IV.**

Count IV alleges that the debt owed to the Plaintiff by the Debtor is nondischargeable under § 523(a)(19) due to a violation of federal securities law.

Section 523(a)(19) provides that a debt is nondischargeable, which:

> (A) is for—
> (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or
> (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

>   (B) results, before, on, or after the date on which the petition was filed, from—
>       (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
>       (ii) any settlement agreement entered into by the debtor; or
>       (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

This section essentially makes a debt nondischargeable where two conditions are met: "[f]irst, the debt must be for a violation of state or federal securities law, or for common law fraud, deceit, or manipulation in connection with a sale of any security. Second, the debt must result from a judgement or court order." *Ahuja v. Fleming* (*In re Fleming*), 637 B.R. 390, 393-94 (Bankr. D. Conn. 2021) (internal citations omitted); *see also In re Sorrells*, 644 B.R. 158, 164 (Bankr. E.D. Tex. Sept. 27, 2022).

"A securities violation alone, without a causal relationship to a resulting debt is insufficient for liability under Section 523(a)(19)." *Race Capital Group LLC v. Tognetti* (*In re Tognetti*), 2007 WL 1080147, at *22 (Bankr. S.D.N.Y. Apr. 9, 2007). Rather, a creditor must show that the debt is "for" the violation of a securities law and "results" in a "judgment, order, consent order, or decree," "settlement agreement," or other "court or administrative order." *Id.* In *Cordius Tr. v. Kummerfeld*, Judge Gonzalez held, in considering whether a debt is nondischargeable, that "[t]he bankruptcy court may . . . make an independent determination concerning whether [a] settlement or judgment arises from a securities law violation." *Cordius Tr. v. Kummerfeld* (*In re Kummerfeld*), 444 B.R. 28, 32 (Bankr. S.D.N.Y. 2011). The "ordinary preponderance-of-the-evidence standard' is the proper standard of proof required." *Id.* at 36 (quoting *Grogan v. Garner*, 498 U.S. 279, 291 111 S. Ct. 654, 661, 112 L. Ed. 2d 755 (1991)).

That FINRA award states that Plaintiff "asserted the following causes of action: breach of fiduciary duty, failure to supervise, unsuitability, failure to follow proper procedures, and negligence. The causes of action relate to various securities including a private placement in CG

Income Fund, LLC." *Schlosser v. Clayborne Group LLC*, Docket No. 18-0027, 2019 WL 1490238 (FINRA), at *1 (Mar. 28, 2019). The FINRA panel found Defendant, Dean Heinemann, and Clayborne Group LLC to be "jointly and severally liable for . . . $250,000 in compensatory damages" to be paid to the Plaintiff." *Id.* at *2. The panel made this award "[a]fter considering the pleadings, the testimony and evidence presented at the hearing." *Id.*

At trial, the Plaintiff presented no evidence as to the basis for the FINRA award. This Court has already noted that the award does not state any basis for its findings, does not state under which of her causes of action the Plaintiff prevailed, and does not specify the timing of any misdeeds. Tr. of Oct. 27, 2020 Hr'g on Summ. J, ECF No. 38. The causes alleged in the FINRA Statement of Claim include claims for under common law and for violation of FINRA Rules. The latter are not federal securities laws under § 523(a)(19). S*houten v. Jakubiak* (*In re Jakubiak*), 591 B.R. 364, 376 (Bankr. E.D. Wisc. 2018). Nor are its rules issued under federal statutes by a government agency, as FINRA is a private, non-profit corporation. *Id.* at 376–77. Moreover, Clayborne and the Debtor were not FINRA members. The Court cannot make any findings as to which of the claims alleged formed the basis of the award. Without that evidence the Court cannot find what the award was "for" a violation of state or federal securities law, or for common law fraud, deceit, or manipulation in connection with a sale of any security.

It bears repeating that the Court does not make any determinations today as to whether the Defendant violated securities laws. That is beyond the scope of this decision. The Court holds only that the Plaintiff has failed to meet her burden of demonstrating a connection between any violation and the resulting debt.

## **CONCLUSION**

For the foregoing reasons, the Court will award judgment to the Debtor, declaring that the debt in question is dischargeable. Debtor's counsel is requested to promptly submit a proposed order consistent with this decision.



**Dated: December 2, 2022**
**Poughkeepsie, New York**

/s/ Cecelia G. Morris
_____
**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**